169 P.3d 14 (2007)
Ray and Julie BIGGERS, husband and wife; Andy Mueller d/b/a Mueller Construction and Andy Mueller, individually; Craig and Sandy Powell, d/b/a Sealevel Bulkhead Builders, Inc., and Home Builders Association of Kitsap County, Respondents,
v.
CITY OF BAINBRIDGE ISLAND, Petitioner.
No. 77150-2.
Supreme Court of Washington, En Banc.
Argued March 16, 2006.
Decided October 11, 2007.
*16 Stephanie Ellen Croll, Michael Charles Walter, Keating Bucklin & McCormack Inc PS, Jay Palmer Derr, Gordon Derr LLP, Peter L. Buck, The Buck Law Group, Seattle, WA, Dawn Findlay Reitan, Inslee Best Doezie & Ryder PS, Rosemary Anne Larson, Attorney at Law, Bellevue, WA, for Petitioner.
Dennis Dean Reynolds, John E. Keegan, Davis Wright Tremaine LLP, Seattle, WA, Traci Lyn Shallbetter, Shallbetter Law, Cle Elum, WA, for Respondents.
Daniel Brian Heid, City of Auburn, Auburn, WA, Milton G. Rowland, Foster Pepper PLLC, Spokane, WA, Amicus Curiae on behalf of Washington State Association of Municipal Attorneys.
Russell Clayton Brooks, Pacific Legal Foundation, Bellevue, WA, Andrew C. Cook, Building Industry Association of Washington, Olympia, WA, Amicus Curiae on behalf of Building Industry Association of Washington, Washington Association of Realtors and Pacific Legal Foundation.
Hilary S. Franz, Hilary S. Franz, Attorney at Law, Bainbridge Island, WA, David Alan Bricklin, Bricklin Newman Dold LLP, Seattle, WA, Amicus Curiae on behalf of Washington Environmental Council.
Laura Colthurst Kisielius, Civil Division, Snohomish County Prosecutor's, Everett, WA, Amicus Curiae on behalf of Snohomish County.
*17 Thomas J. Young, Katharine G. Shirey, Attorney General's Office, Ecology Division, Alan D. Copsey, Office of the Atty. General, Olympia, WA, Amicus Curiae on behalf of Washington Department of Ecology and Washington State Dept. of Community Trade & Economic Development.
J.M. JOHNSON, J.
¶ 1 Today, we review the Bainbridge Island City (City) Council's adoption of rolling moratoria, which imposed a multi-year freeze on private property development in shoreline areas. The City denied the processing of permit applications for more than three years. There is no state statutory authority for the City's moratoria or for these multiple extensions. Clearly, this usurpation of state power by the local government disregards article XVII, section 1 of the Washington Constitution, which expressly provides that shorelines are owned by the state, subject only to state regulation. The City is not authorized to adopt moratoria on shoreline development arising out of its police powers under article XI, section 11 of the Washington Constitution, which limits local government to regulation "not in conflict with general laws." Thus, we affirm both the trial court and the unanimous Court of Appeals decision invalidating the ordinances.

SUMMARY OF THE CASE
¶ 2 The ultimate subject of this lawsuit is the construction of shoreline structures designed to protect the land of shoreline property owners. These structures are, by definition, improper subjects for city-issued moratoria because inaction leaves all shoreline property defenseless against erosion. See e.g. RCW 90.58.020 (calling for effective and timely protection for the shorelines of single family residences).[1] Despite the clear violation of property owners' rights, the City embraced the moratoria as a means to refuse consideration of any permit applications, thereby deferring difficult development decisions.
¶ 3 Under the City's scheme, suspension of the application process left private property owners to bear the costs associated with this denial of process (including property erosion and economic loss).[2]See W. Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 51-52, 720 P.2d 782 (1986) (noting the costs to society where property owners cannot plan developments with reasonable certainty). Clearly, the City's procrastination resulted in a physical degradation of these private owners' property without any direct cost to the City.
¶ 4 In its defense, the City argues that the moratoria were necessary to allow time to update its Shoreline Master Program (SMP). This argument is undercut by an inconvenient truth: the relevant statutes do not require the SMP to be updated until December 1, 2011. RCW 90.58.080(2)(a)(iii). It is unclear whether the City planned to ban applications until 2011, thereby allowing erosion damage to continue unabated for 10 years. Prior to this civil action, the City had years to make any required plan changes but did not do so. The City justified its moratoria actions by arguing that any new construction permitted may harm the shoreline habitat. This rationale cites potential harm rather than actual, demonstrated harm. Standing alone, theoretical harm is not enough to deny private property owners fundamental access to the application review process, or protection and use of their property.
*18 ¶ 5 The importance of shorelines of statewide significance is codified in the Shoreline Management Act of 1971, chapter 90.58 RCW (SMA), and the SMA balanced this policy with the rights of private property owners. See RCW 90.58.020. Under the SMA, the state has the primary authority to manage shoreline development. This is done in a coordinated fashion, in conjunction with local governments. There is no authority in the SMA, express or inherent, which justifies the City's attempt to impose unilateral moratoria. Municipalities possess only those powers given by the legislature. See Lutz v. City of Longview, 83 Wash.2d 566, 570, 520 P.2d 1374 (1974). Moreover, the SMA does not allow for a city-adopted moratorium, and the SMA cannot be amended by implication.

FACTS AND PROCEDURAL HISTORY
¶ 6 The City of Bainbridge Island constitutes the entire island, located in Puget Sound and surrounded by approximately 48 miles of shoreline. The City adopted its SMP in 1996 in conjunction with its comprehensive plan under the Growth Management Act, chapter 36.70A RCW (GMA). The City's SMP identifies environmentally sensitive areas and native vegetation on the island, designates shoreline uses by area, sets out specific shoreline use regulations and plan administration, and includes a map. The parties agree that the City's SMP does not contain any reference to the use of moratoria on shoreline development.
¶ 7 In August 2001, city staff requested the City council to adopt a moratorium on shoreline development pending revision of the SMP ostensibly because the City staff lacked scientific information needed to assess the possible environmental effects of shoreline development on salmon habitat. On August 22, 2001, the City adopted Ordinance 2001-34, which imposed a one-year moratorium on filing "new applications for shoreline substantial development permits, shoreline substantial development exemptions and shoreline conditional use permits." Clerk's Papers (CP) at 140. The moratorium did not apply to "applications solely for [the purpose of] normal maintenance, normal repair and emergency repair of existing structures." Id. The ordinance stated that the City needed additional time to study scientific information and revise its SMP, "during which time significant shoreline habitat that supports a species threatened with extinction could be lost or damaged." Id. The ordinance referred to authority set out in RCW 35A.63.220 and RCW 36.70A.390 and stated that the City would hold a public hearing within 60 days and prepare findings of fact in accordance with those procedures.
¶ 8 In October 2001, the City held a public hearing and adopted Ordinance 2001-45, which amended Ordinance 2001-34. This ordinance did not amend the one-year term but altered the scope of the moratorium. The moratorium continued to prohibit the filing of new applications for shoreline substantial development permits, exemptions, and shoreline conditional use permits, but applied only to "new overwater structures (piers, docks and floats) and new shoreline armoring (bulkheads and revetments) where none has previously existed." CP at 147. Ordinance 2001-45 also exempted from the moratorium "shoreline permits for single family residences and their normal appurtenances," but did not exempt normal maintenance, normal repairs, or emergency repairs as had Ordinance 2001-34. Id. The newest ordinance also provided findings of fact which stated that piers, docks, and bulkheads could potentially have a significant impact on shoreline habitat, and that the moratorium was focused on the "structures that have the greatest potential to impact shoreline habitat." CP at 146. The ordinance stated that the moratorium was "necessary for the protection of the public health, safety, property, or peace, including the protection of shoreline habitat that supports a species threatened with extinction." CP at 147.
¶ 9 Ray and Julie Biggers filed their original complaint after the City enacted Ordinance 2001-45, seeking a declaratory judgment that the moratorium was illegal and void. In their complaint, Biggers argued that the moratorium (1) violated article XI, section 11 by conflicting with the general laws of the state; (2) exceeded the scope of the City's statutory authority under RCW 35A.63.220 and RCW 36.70A.390, which do *19 not permit moratoria for shoreline regulations; (3) was for impermissible purposes; and (4) invalidly amended the City's SMP.[3] While the case was pending, the City reviewed an environmental assessment and prepared a draft revised SMP.
¶ 10 In August 2002, the City held a public hearing to discuss extending the moratorium. Following the hearing, the City enacted Ordinance 2002-29, extending the moratorium for seven additional months. The ordinance cited the City's ongoing efforts to revise its SMP and stated that the City would not complete the revisions until early 2003. Like Ordinance 2001-45, Ordinance 2002-29 provided findings of fact to support the moratorium, including a statement that the moratorium was "necessary for the protection of the public health, safety, property, or peace, including the protection of shoreline habitat that supports a species threatened with extinction." CP at 152. Biggers filed an amended complaint, adding allegations relating to Ordinance 2002-29.
¶ 11 Both parties moved for summary judgment. In their motion for summary judgment, Biggers argued that the power to adopt moratoria is not included in the City's power to regulate shoreline use under the SMA. The City argued that it has authority to adopt moratoria under the express statutory grants of authority in RCW 35A.63.220 and RCW 36.70A.390.
¶ 12 The trial court issued a memorandum decision granting summary judgment to Biggers. The court determined that the moratorium was not a de facto amendment of the City's SMP. The court also concluded that the City did not have implied authority to adopt a moratorium under the SMA. The court reasoned that the legislature granted "ultimate authority to the Department of Ecology to approve decisions made by local governing agencies concerning shorelines." CP at 785. It further determined that even if the City did have implied authority, the moratorium in this case conflicted with the SMA general law of the State because this moratorium improperly imposed restrictions on shoreline developments that "are exempt from the shoreline management program requirements." CP at 786. It also concluded that the City had "overstepped its constitutional limits in passing the moratorium ordinance." CP at 788.
¶ 13 The City filed a notice of appeal, and the commissioner of the Court of Appeals stayed the judgment pursuant to RAP 8.1(b)(2). While the judgment was stayed, the City enacted Ordinance 2003-34, which extended the moratorium for another year (with slight modifications). It stated that extension was necessary "while the City considers the amendment to the [SMP] and implementing regulations relating to docks and piers in Blakely Harbor, and obtains necessary approvals of the amendments." City's Opening Br., App. 10, at 6. At the same meeting, the City adopted Ordinance 2003-30, which proposed amendments to the City's SMP.
¶ 14 At the Court of Appeals, the City continued to argue that RCW 35A.63.220 and RCW 36.70A.390 are express statutory grants of authority to adopt moratoria. Biggers agreed that RCW 35A.63.220 and RCW 36.70A.390 are express grants of authority but continued to argue that these statutes do not apply to shoreline development. Biggers further argued that the authority to adopt moratoria is not part of the City's police powers if inconsistent with the general state laws (SMA) and argued that the City may not adopt moratoria absent express statutory authority.
¶ 15 The Court of Appeals affirmed the trial court but ultimately denied Biggers' request for attorney fees under RCW 4.84.370. Biggers v. City of Bainbridge Island, 124 Wash.App. 858, 868, 103 P.3d 244 (2004). The court concluded that while RCW 35A.63.220 and RCW 36.70A.390 are express grants of authority, neither statute applied to shoreline development because shoreline management regulations and SMPs "do not fall within the definition of zoning." Id. at 866, 103 P.3d 244. The court further held that RCW 36.70A.390 is "limited to growth *20 management in selected counties and cities" and "does not apply to shoreline management." Id. The court reasoned that because the GMA "clearly specifies that [the SMA] governs the unique criteria for shoreline development," the SMA "trumps the GMA in this area" and the "SMA does not provide for moratoriums on shoreline use or development." Id. at 867, 103 P.3d 244.
¶ 16 The City petitioned this court to determine whether the Court of Appeals erred in ruling that the City lacks inherent constitutional and/or statutory authority to adopt moratoria. In its petition for review, the City continued to argue that it had statutory authority to adopt moratoria, but only under RCW 36.70A.390. However, the City also argued in its petition that under article XVII, section 1 of the Washington Constitution it has inherent constitutional authority to adopt moratoria on shoreline development.[4]
¶ 17 Biggers agreed that RCW 36.70A.390 is an express grant of authority to adopt moratoria, but argued that this statute applies only to land use actions under the GMA. Biggers also sought review of the Court of Appeals denial of attorney fees. We granted review. Biggers v. City of Bainbridge, 156 Wash.2d 1005, 132 P.3d 146 (2006).
¶ 18 In its supplemental brief to this court, the City argued for the first time that it has authority to adopt moratoria under the state constitution's broad grant of police power to cities and counties in article XI, section 11. The City abandoned its earlier argument that RCW 36.70A.390 grants express authority to adopt moratoria, arguing instead that the statute addresses how existing constitutional authority should be exercised. Biggers filed a motion to strike the City's article XI, section 11 argument from the supplemental brief, and the motion was passed to the merits. The City insists that it has fully briefed the argument both at the Court of Appeals and to this court.

MOTION TO STRIKE
¶ 19 Biggers' motion to strike the article XI, section 11 argument of the City's supplemental brief and related amici briefing was passed to the merits on February 23, 2006. We recognize that this court can review all arguments necessary to "`serve the ends of justice'" including those issues not raised at the trial or appellate court level. Tuerk v. Dep't of Licensing, 123 Wash.2d 120, 124, 864 P.2d 1382 (1994) (quoting Kruse v. Hemp, 121 Wash.2d 715, 721, 853 P.2d 1373 (1993)); see also Harris v. Dep't of Labor & Indus., 120 Wash.2d 461, 468, 843 P.2d 1056 (1993). However, we have consistently followed RAP 13.7(b), which states "the Supreme Court will review only the questions raised in the motion for discretionary review. . . ."[5] Here, the relevant constitutional argument was not raised in the City's motion or petition for review. This issue was raised by Biggers earlier in the litigation, in the context that any exercise of City authority may not be "in conflict with general laws," and is cited by the trial court in its order for summary judgment. To this extent, Biggers cannot claim it has insufficient notice of the constitutional provision or that it is unfairly prejudiced by the City's argument. Thus, we grant the motion to strike to the extent the briefing seeks to extend the issue beyond the arguments raised below and decided herein.

STANDARD OF REVIEW
¶ 20 When reviewing an order granting summary judgment, we engage in de novo review, taking all facts and inferences in the light most favorable to the nonmoving *21 party. Boag v. Farmers Ins. Co. of Wash., 117 Wash.App. 116, 121, 69 P.3d 370 (2003).

ANALYSIS
A. Local Government Has Limited Power Over State Shorelines
¶ 21 We begin our constitutional analysis with article XI, section 11 of the Washington Constitution. Section 11 includes a specific exception to its simple statement of the general police powers of local governments: "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." (Emphasis added.); see also, e.g., HJS Dev., Inc. v. Pierce County, 148 Wash.2d 451, 482, 61 P.3d 1141 (2003) ("Local jurisdictions may enact ordinances upon subjects already covered by state legislation if their enactment does not conflict with state legislation" (citing Lenci v. Seattle, 63 Wash.2d 664, 670, 388 P.2d 926 (1964))).
¶ 22 Any grant of police power to local government is subject to constitutional limitation, which is judicially enforced. "Our cases uniformly state that exercises of the police power are subject to judicial review." Petstel, Inc. v. County of King, 77 Wash.2d 144, 154, 459 P.2d 937 (1969). See also State ex rel. Brislawn v. Meath, 84 Wash. 302, 313, 147 P. 11 (1915) (observing that if a police power regulation "`has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution'" (quoting Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205 (1887))). Courts will not expand the powers of local government beyond express delegations. See City of Spokane v. J-R Distributors, Inc., 90 Wash.2d 722, 726, 585 P.2d 784 (1978); see also Lauterbach v. City of Centralia, 49 Wash.2d 550, 554, 304 P.2d 656 (1956).
¶ 23 The City belatedly attempted to rely on a new right of local government to issue moratoria on development of private property on shorelines of statewide significance. This argument was based upon a theory of city power that the City did not argue to the trial court or to the Court of Appeals; for good reason, the argument fails. Article XVII, section 1 of the Washington Constitution declares that shorelines were originally owned by the state, and therefore subject to state regulation. Even after sale or lease of shorelines, the state continues to hold remaining sovereign interests of the public. Indeed, the SMA was expressly based on the proposition that shorelines are of "statewide significance." Local governments do not possess any inherent constitutional police power over state shoreline use.
¶ 24 The Washington Constitution's recognition of local government police powers "not in conflict with general laws" must be understood in light of article XVII, section 1. That provision provides:
The state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes.
Article XVII, section 1 of the Washington Constitution asserts that powers of the state, in this context, are controlling over any powers of local government. Therefore, the police power question presented in this case involves a simple, bright-line matter of jurisdiction. Under article XVII, section 1, the state has the power to regulate shorelines.
¶ 25 Under the Washington Constitution, local governments have no broad police power over shorelines. Neither the history of article XVII, section 1 nor its interpretation by the courts of this state suggests it allows local governments permit authority over shoreline development in violation of state law or policies, much less power to declare moratoria on shoreline development. See Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993) ("the duty imposed by the public trust doctrine devolves upon the State, not any particular agency thereof") aff'd in part and rev'd in part on other grounds, 128 Wash.2d 508, 910 P.2d 462 (1996).
*22 ¶ 26 The limitation on local police power over shoreline use and development is reinforced by the public trust doctrine. See Rettkowski, 122 Wash.2d at 232, 858 P.2d 232 (holding that the public trust doctrine is "partially encapsulated" in article XVII, section 1). According to the public trust doctrine, the shorelines and state waters are held by the state, in trust for all the people of the state. See Ill. Cent. R.R. Co. v. Illinois, 146 U.S. 387, 455, 13 S.Ct. 110, 36 L.Ed. 1018 (1892) ("The ownership of the navigable waters of the harbor and of the lands under them is a subject of public concern to the whole people of the State."), aff'd, 154 U.S. 225, 14 S.Ct. 1015, 38 L.Ed. 971 (1894). "The state can no more convey or give away this jus publicum interest than it can `abdicate its police powers in the administration of government and the preservation of the peace.'" Caminiti v. Boyle, 107 Wash.2d 662, 669, 732 P.2d 989 (1987) (quoting Ill. Cent. R.R. Co., 146 U.S. at 453, 13 S.Ct. 110).
¶ 27 Clearly, the interests of all Washington residents in these shorelines cannot be impliedly abdicated to local governments. A state statute, such as the SMA, may serve to delegate some state power. Thus, regulation of the use and development of shorelines under the SMA is derived from the state, which holds all such shorelines in trust for all people of this state under the constitution.
¶ 28 The doubtful existence of any "implied" city power over state shorelines is further indicated by its belated discovery years after these moratoria were issued. No prior case or statute is directly cited in support of this argument. The City did not rely upon any "implied" constitutional power when it voted for the ordinance to institute a moratorium nor on the numerous occasions it voted for extended moratoria. The City notices of ordinances do not claim such a power. Instead, the City consistently asserted that there was an express statutory grant of authority. See CP at 136 (Ordinance No.2001-32) (citing RCW 35A.63.220 and RCW 36.70A.390 for authority to adopt moratoria); CP at 139-40 (Ordinance No.2001-34) (citing RCW 35A.63.220 and RCW 36.70A.390 for authority to adopt moratoria).
¶ 29 Strikingly, the City also never argued to the trial court that it had any "implied" constitutional authority. Moreover, the City admits it never argued for such "implied" authority to the Court of Appeals. See City of Bainbridge Island's Reply Br. at 3 ("The City has never argued that it has `implied' powers that gave it the ability to impose the Moratorium."). The posthoc rationalization made to this court for the offending moratoria is indefensible and inconsistent with the constitution's limitation on local government. See WASH. CONST. article XI, section 11 (granting local government only those powers "not in conflict with general laws.").
B. The SMA Precludes Local Moratoria on Shorelines
¶ 30 The SMA was enacted by vote of the people in 1971 as Initiative 43B. The vote reflected the decision of the voters choosing between a citizen initiative and the legislature's alternative (see WASH. CONST. art. II, § 1). See Geoffrey Crooks, The Washington Shoreline Management Act of 1971, 49 WASH. L.REV. 423, 424-25 (1974). The people of this state thus made the SMA the explicit source of procedures concerning shoreline development. The notion that local governments do not have separate power to issue moratoria on development of state shorelines is reflected in the provisions of the SMA, which delegate only specified powers to local governments. See RCW 90.58.010 through .920. Under the plain terms of the SMA, there is no provision for cities to adopt moratoria. Thus, such moratoria on shoreline development conflict with the general laws of the state.
¶ 31 The SMA embodies a legislatively-determined and voter-approved balance between protection of state shorelines and development. The state has developed shorelines through improvement of parks and ramps, construction of bulkheads, ferry docks, etc. As part of our careful management of shorelines, property owners are also allowed to construct water-dependent facilities such as single-family residences, bulkheads, and docks. Imposition of a total moratorium conflicts with this regulatory system established by the SMA.
*23 ¶ 32 The SMA also recognized there is an important function performed by structures that protect shorelines. The legislature's 1992 amendments to the SMA further emphasized this need for certain shoreline structures to provide for the protection of shorelines. This conclusion is illustrated by the SMA's provisions requiring prompt adoption of SMPs and shoreline structure permit processing.
¶ 33 The SMA contains an express "preference" for issuing such permits. RCW 90.58.100(6). Thus, the SMA also requires that all SMPs contain methods to achieve "effective" and "timely" protection for shoreline landowners. Id. SMPs must provide for "the issuance of substantial development permits for shoreline protection, including structural methods such as construction of bulkheads. . . ." Id. Permit application to local governments must be processed in a timely manner. See id.
¶ 34 A permit for substantial development on shoreline "shall be granted" when development is consistent with the applicable SMP and provisions of the SMA. RCW 90.58.140(2). This is a mandatory provision included in each city-adopted SMP before Ecology approves: "[e]ach master program shall contain standards governing the protection of single family residences and appurtenant structures against damage or loss due to shoreline erosion." RCW 90.58.100(6) (emphasis added).
¶ 35 The desirability of some shoreline structures is further evidenced by the requirement that SMPs include exemptions from permitting requirements for certain structures. See RCW 90.58.030(3)(e). Activities exempted from the "substantial development" permit requirement include the installation of a protective bulkhead for a single family home, maintenance and repair of existing structures, and construction that is necessary for agricultural activities. See RCW 90.58.030(3)(e)(i)-(iv).
¶ 36 As previously noted, our constitution provides that all local police power measures may not conflict with the general law of the state. See WASH. CONST. art. XI, § 11; HJS Dev., 148 Wash.2d at 482, 61 P.3d 1141; Lenci, 63 Wash.2d at 670, 388 P.2d 926. Of course, this rule equally applies to procedures found in the SMA.
¶ 37 In direct conflict with this constitutional principle, the City's moratoria on processing applications prohibits what state law permits. See HJS Dev., 148 Wash.2d at 482, 61 P.3d 1141; Rabon v. City of Seattle, 135 Wash.2d 278, 292, 957 P.2d 621 (1998). Without amending the 1996 SMP, which received the required approval from the Department of Ecology, the City imposed moratoria blocking developments which the SMP approved. See RCW 90.58.090 (a master program or amendment proposed by local government shall be effective when approved by the Department of Ecology). The SMA's statewide mandates, and the coordinated system established by that act, are thwarted by the City's rolling moratoria.
¶ 38 This court has frequently held that local governments possess only those powers expressly delegated or found by necessary implication. See J-R Distributors, 90 Wash.2d at 726, 585 P.2d 784; see, e.g., Lauterbach, 49 Wash.2d at 554, 304 P.2d 656; Pac. First Fed. Sav. & Loan Ass'n v. Pierce County, 27 Wash.2d 347, 353, 178 P.2d 351 (1947); State ex rel. Hill v. Bridges, 87 Wash. 260, 261, 151 P. 490 (1915). Where there is doubt as to the existence of a state power arguably conferred to a local government, this court will construe the question against local government and against the claimed power. See J-R Distributors, 90 Wash.2d at 726, 585 P.2d 784. Here, because the SMA is the exclusive source of shoreline development regulation and because the SMA makes no affirmative grant of moratoria authority, local governments do not have implied power to adopt moratoria. The City's imposition of moratoria was ultra vires and in conflict with the SMA's regulatory framework.
¶ 39 The City's moratoria also violate the principles of Washington Constitution's article XVII, section 1 and the public trust doctrine. The authors of our constitution would be surprised by the City's claim of power, as would the voters who approved the SMA.
¶ 40 The City's argument about implied or inherent power is further undermined by the *24 legislature's adoption of comparable statutes that do contain an express grant of moratoria authority. See Sheehan v. Cent. Puget Sound Reg'l Transit Auth., 155 Wash.2d 790, 797, 123 P.3d 88 (2005). In 1992, the legislature expressly authorized moratoria under multiple statutes: chapter 35.63 RCW (planning commissions); chapter 35.22 RCW (first class cities); chapter 35A.63 RCW (planning and zoning in code cities); chapter 36.70A RCW (growth management); chapter 36.32 RCW (county commissioners); and chapter 70.05 RCW (local health departments). Strikingly, the legislature did not grant local government moratoria authority in its 1992 amendments to the SMA. This confirms our judgment that such moratorium power does not exist where it is not expressly granted.
¶ 41 Either the legislature or the people could have conferred moratoria authority to local governments by affirmative enactment. Neither chose to do so when adopting the SMA, or later.
C. The GMA Does Not Establish a Local Moratorium Power over Shorelines
¶ 42 The GMA does not displace the SMA as the framework for statewide shoreline regulation. Rather, the legislature carefully and explicitly preserved the integrity of the SMA's adoption and approval procedures. The GMA makes this clear. Subsections of the GMA reiterate that the provisions of the SMA remain the source of adoption procedures for shoreline development.
(2) The shoreline master program shall be adopted pursuant to the procedures of chapter 90.58 RCW rather than the goals, policies, and procedures set forth in this chapter for the adoption of a comprehensive plan or development regulations.
(3) The policies, goals, and provisions of chapter 90.58 RCW and applicable guidelines shall be the sole basis for determining compliance of a shoreline master program with this chapter except as the shoreline master program is required to comply with the internal consistency provisions of RCW 36.70A.070, 36.70A.040(4), 35.63.125, and 35A.63.105.
RCW 36.70A.480(2), (3). See also Biggers, 124 Wash.App. at 867, 103 P.3d 244 ("the GMA states that the provisions of chapter 90.58 RCW take priority over the GMA as long as the provisions are internally consistent with a few specific statutes, none of which apply under these facts").
¶ 43 The policies and procedures of the SMA predated the GMA and were part of land use laws when the GMA was adopted in 1990. The 1995 amendments to the GMA simply provide that the goals and policies of a city's shoreline master program shall be considered a part of that city's GMA comprehensive plan. See RCW 36.70A.480(1). The legislature thus recognized the distinctiveness of shorelines and the need for consistency, and a continuing regulatory regime for shorelines.
¶ 44 The process for adopting shoreline master programs is different from the process for adopting GMA comprehensive plans and regulations. The SMA did not vest planning authority exclusively in local government, as did the GMA. Instead, the SMA provides for state checks and balances on local authority, including the requirement that the Department of Ecology approve all local shoreline master plans before they become effective. RCW 90.58.090(1). A city may not block implementation of the state-approved SMP through use of local moratoria. To do so would be to put the City in conflict with a mandate imposed by general laws of the state.
¶ 45 Although the GMA frequently mentions shoreline master programs, the GMA could not alter the provisions of the SMA without express amendment. Article II, section 37 of the Washington Constitution provides: "No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length." No such express amendments of the SMA were included in the GMA. Rather, "[t]he GMA clearly specifies that chapter 90.58 RCW (the SMA) governs the unique criteria for shoreline development." Biggers, 124 Wash.App. at 867, 103 P.3d 244.
D. Attorney Fees
¶ 46 The Biggers qualify for reasonable attorney fees and costs under RCW *25 4.84.370(1)(b) because they were "the prevailing party or substantially prevailing party in all prior judicial proceedings" in a matter that qualifies for the award of attorney fees and costs. The City's moratorium constitutes a "land use . . . decision" pursuant to RCW 4.84.370(1). RCW 4.84.370(1) extends not only to the actions expressly listed but also to other, "similar land use approval[s] or decision[s]." The moratorium denial of permit applications falls within this meaning of the statute. Furthermore, the City's moratorium was initiated through a site-specific determination. Where local government promulgates a moratorium that bans applications from each site, the application of such a moratorium is a "land use . . . decision" for purposes of RCW 4.84.370(1).

CONCLUSION
¶ 47 The protection of Washington's shorelines for all citizens is an important state constitutional interest reflected in the SMA enacted by the people. No local government may impose regulations that are in conflict with the state's general laws. Here, the City's imposition of repeated moratoria was unconstitutional and unlawful. We affirm.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, RICHARD B. SANDERS and BOBBE J. BRIDGE, JJ.
CHAMBERS, J. (concurring in result).
¶ 48 I concur with my learned colleague, Justice J.M. Johnson, that the Court of Appeals decision below should be affirmed. I agree, perhaps for different reasons with the trial court that the City of Bainbridge Island overstepped its constitutional limits by passing rolling building development moratoria year after year.
¶ 49 Although in desperate need of streamlining, land use law balances the tension between the need for intelligent planning to achieve efficient and responsible use of our resources on the one hand, and the right of property owners to use and enjoy their own property on the other hand. Done right, master plans can serve both needs. Master plans guide growth and ensure that communities will have reasonable notice of how that growth will proceed and how it will be accommodated. If municipalities are allowed to stretch out the process of developing and revising their master plans for years and years without meaningful progress while imposing a rolling moratorium preventing the acceptance, administration, and enforcement of building permits under the Shoreline Management Act of 1971(SMA), chapter 90.58 RCW, planning critical to people, the community, and the State will be frustrated.
¶ 50 I write separately in part to state in unequivocal terms my view that the City of Bainbridge Island's year after year renewal of a shoreline building permit moratorium was an act of a stagnant municipal government. Those who govern fail the public's trust when they are unwilling, unable, or simply neglect to roll up their sleeves, gather the information necessary, and make the tough decisions they are elected to make. Passing annual, rolling moratoria reflects a disregard for those within its geographical limits who wish to fully enjoy the use and benefits of the property they own and the need of individuals to engage in their own critical planning. People who have property within the city's boundaries, perhaps their largest asset in the world, are impacted by a moratorium in their ability to use, improve, or transfer property and their ability to plan for personal, family, and business purposes. In my view, the city's failure to meaningfully govern while depriving people of the ability to use or plan for the use of their property was unreasonable and exceeded any constitutional authority it may have had.
¶ 51 That said, I largely agree with Justice Fairhurst's analysis of the law applicable to this case. But I respectfully disagree with her that this rolling moratorium enacted by the city was a reasonable use of the city's power. While I disagree with the lead opinion's conclusion that the city lacks authority to impose any shoreline moratoria, I do agree that this moratorium exceeded its lawful power. A reasonable moratorium may be a valid exercise of a municipality's power as such an exercise of power may give the city time to create a comprehensive plan. See generally Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, *26 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (rejecting claims that a 32-month moratorium was a takings); Collura v. Town of Arlington, 367 Mass. 881, 886, 329 N.E.2d 733 (1975) (collecting cases); see also Matson v. Clark County Bd. of Comm'rs, 79 Wash.App. 641, 644-45, 904 P.2d 317 (1995) (citing RICHARD L. SETTLE, WASHINGTON LAND USE AND ENVIRONMENTAL LAW AND PRACTICE § 2.13, at 72 (1983)). But a reasonable moratorium must be in place no longer than necessary to accomplish the necessary planning by a body exercising diligence to accomplish that planning. Then, the moratorium must be removed.
¶ 52 While no positive grant of authority exists under the SMA to impose a moratorium, such an explicit grant is not required in the face of Washington Constitution article XI, section 11's broad delegation of police power to the local governments. Cf. Weden v. San Juan County, 135 Wash.2d 678, 690-92, 958 P.2d 273 (1998). Further, the power is clearly implied by the procedural fetters the legislature has placed upon it. RCW 36.70A.390. But like any power, it is not substantially limitless. It must be used in a reasonable manner by a diligent governing body.
¶ 53 I also respectfully disagree with the lead opinion's conclusion that article XVII of our constitution restricts a municipality's power to regulate the shorelines and tidelands. The power to regulate does not ride like a parasite on the State's title to some of the lands in the state. Cf. lead opinion at 21-22. Instead, the State's power to regulate shore lands comes from the people's sovereign power to regulate land use to serve the health, safety, and welfare of the citizenry. See Buechel v. Dep't of Ecology, 125 Wash.2d 196, 203, 884 P.2d 910 (1994) ("[The legislative policy behind the SMA] contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally the public right of navigation and corollary rights incidental thereto."). Further, this is a power the State has chosen to share with its municipalities. RCW 90.58.050 ("This chapter establishes a cooperative program of shoreline management between local government and the state." (emphasis added)); see also RCW 90.58.140(3) ("The local government shall establish a program . . . for the administration and enforcement of the permit system provided in this section.").
¶ 54 This sharing of police power with municipalities is a foundational principle of our State. See Hugh D. Spitzer, Municipal Police Power in Washington State, 75 WASH. L.REV. 495, 497-98 (2000). It is embodied in article XI, section 11 and appears in everything from criminal prosecutions to health and safety regulations. More specifically, the State has chosen to share its power to regulate with its municipalities through the mandates and guidelines of the SMA. I agree with Justice Fairhurst that analysis under the local police power provision is proper to resolve this case. Cf. dissent at 27. Thus, our analysis should not begin with article XVII, but rather with article XI, section 11 and the SMA.[1]
¶ 55 Our law provides a sensible framework to determine whether a municipality has stepped outside of the bounds of its authority. Article XI, section 11 reads: "Any county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws." This court, for nearly a century, has maintained a three part analysis to test compliance under article XI, section 11. A municipality's use of the police power will be upheld if (1) the *27 matter is local and the use (2) is not in conflict with the general laws and (3) is reasonable. Weden, 135 Wash.2d at 692, 958 P.2d 273; see also Hass v. City of Kirkland, 78 Wash.2d 929, 932, 481 P.2d 9 (1971) ("`[Article XI, section 11] is a direct delegation of the police power as ample within its limits as that possessed by the legislature itself. It requires no legislative sanction for its exercise so long as the subject-matter is local, and the regulation reasonable and consistent with the general laws.'" (quoting Detamore v. Hindley, 83 Wash. 322, 326, 145 P. 462 (1915))). This moratorium was a local matter, so the matter turns on the last two prongs of the Weden test.
¶ 56 Municipalities possess independent authority to regulate shorelines so long as the regulation does not conflict with the SMA. I agree with Justice Fairhurst that municipalities can place moratoria on shoreline substantial development permits without conflict with the SMA. See dissent at 28. The lead opinion contends also that the SMA precludes local implementation of shoreline permit moratoria. Lead opinion at 22. I respectfully disagree. In fact, the SMA "imposes minimum standards which local government[s] . . . may exceed as they see fit." Settle, supra, § 4.16(a) at 160 (emphasis added).
¶ 57 In conclusion, in my view, it is arrogant, high handed, and beyond the pale of any constitutional authority for a stagnant government to deny its citizens the enjoyment of their land by refusing to accept building permits year after year based on a "rolling" moratorium. Excessive rolling moratoria frustrate the efficient regulation of land and violate individual rights. Because I find the city's use of its police power unreasonable, I would affirm the Court of Appeals. Because the landowners are the prevailing party challenging a land use decision, I agree with the lead opinion that they are entitled to fees and costs under RCW 4.84.370(1).
FAIRHURST, J. (dissenting).
¶ 58 The city of Bainbridge Island did not misuse the broad police powers granted to it under article XI, section 11 of the Washington Constitution, or "usurp[ ] . . . state power" under article XVII, section 1 of the Washington Constitution. See lead opinion at 17. Because the city acted properly and constitutionally when it adopted its temporary moratorium, I respectfully dissent.

Article XI, Section 11
¶ 59 Article XI, section 11[1] vests local government with broad authority. Weden v. San Juan County, 135 Wash.2d 678, 690-92, 958 P.2d 273 (1998). Within its own boundaries, a local government's power is equivalent to the power of the Statea power that both the United States Supreme Court and this court have acknowledged is "vast." Id. at 691-92, 958 P.2d 273 (citing Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894); City of Seattle v. Ford, 144 Wash. 107, 111-12, 257 P. 243 (1927)). Since those early cases, we have continued to reaffirm that
"[m]unicipal police power is as extensive as that of the legislature, so long as the subject matter is local and the regulation does not conflict with general laws. . . . The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people."
Id. at 692, 958 P.2d 273 (alterations in original) (quoting Covell v. City of Seattle, 127 Wash.2d 874, 878, 905 P.2d 324 (1995)). To the extent that enabling statutes are silent regarding the local government's authority, the local government's police powers govern its actions. Id. at 695, 958 P.2d 273 ("We `will not interpret a statute to deprive a municipality of the power to legislate on particular subjects unless that clearly is the legislative intent.'" (quoting Southwick, Inc. v. City of Lacey, 58 Wash.App. 886, 891-92, 795 P.2d 712 (1990))).
*28 ¶ 60 Land use scholars and courts recognize that moratoria are valid tools for local government to forestall filing of permit applications when amending land use regulations. See 3 PATRICK J. ROHAN, ZONING AND LAND USE CONTROLS, § 22.02[3][b][i], at 22-21 (2005); RICHARD L. SETTLE, WASHINGTON LAND USE AND ENVIRONMENTAL LAW AND PRACTICE, §§ 2.13, 2.14, at 72-74 (1983); see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 337-38 n. 33, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); Almquist v. Town of Marshan, 308 Minn. 52, 245 N.W.2d 819, 825 (1976). Some courts have recognized that moratoria may be adopted even in the absence of express statutory authorization. See Collura v. Town of Arlington, 367 Mass. 881, 329 N.E.2d 733, 737 (1975) (citing cases from the First Circuit Court of Appeals, California, Connecticut, and New Jersey); Jablinske v. Snohomish County, 28 Wash.App. 848, 850-51, 626 P.2d 543 (1981). Only a minority of jurisdictions has held that local government must have express authority to adopt moratoria. Naylor v. Twp. of Hellam, 565 Pa. 397, 409, 773 A.2d 770 (2001) (holding that the power to adopt moratoria is not part of a municipality's power to regulate land under the state constitution); Lancaster Dev., Ltd. v. Vill. of River Forest, 84 Ill.App.2d 395, 228 N.E.2d 526, 529 (1967).
¶ 61 A local ordinance is consistent with article XI, section 11 if it does not conflict with a general law of the State, it is a reasonable exercise of the local government's police power, and the subject matter of the ordinance is local. Weden, 135 Wash.2d at 692-93, 958 P.2d 273. The test of whether an ordinance conflicts with general law is if it "`permits or licenses that which the statute forbids and prohibits, and vice versa.'" Id. at 693, 958 P.2d 273 (internal quotation marks omitted) (quoting City of Bellingham v. Schampera, 57 Wash.2d 106, 111, 356 P.2d 292 (1960)). An ordinance is a reasonable exercise of police powers if it "`promotes public safety, health or welfare and bears a reasonable and substantial relation to accomplishing the purpose pursued.'" Weden, 135 Wash.2d at 700, 958 P.2d 273 (quoting City of Seattle v. Montana, 129 Wash.2d 583, 592, 919 P.2d 1218 (1996)). An ordinance is local if its effect is within the city's boundaries and any effect outside the city is only incidental. Weden, 135 Wash.2d at 706, 958 P.2d 273.
¶ 62 We have held that an ordinance conflicted with state law where the state law required the local government to follow certain procedures to amend a zoning classification but the local government dispensed with those procedures. Lauterbach v. City of Centralia, 49 Wash.2d 550, 553-54, 304 P.2d 656 (1956). Similarly, one Washington court held a local government's actions conflicted with state law when it required a substantial development permit for a project that the Shoreline Management Act of 1971(SMA), chapter 90.58 RCW, expressly exempted from the permit requirement. Ritchie v. Markley, 23 Wash.App. 569, 574, 597 P.2d 449 (1979). We held that a ban on operation of motorized personal watercraft (PWC) in certain areas did not conflict with the SMA because it was consistent with the SMA's purpose  to favor the resources and ecology of the shoreline over recreational interests. Weden, 135 Wash.2d at 696-97, 958 P.2d 273.
¶ 63 Like the ban on operation of PWCs in Weden, the city's suspension of development while it revised its shoreline master program (SMP) and obtained additional scientific information did not conflict with the SMA's purpose of preserving the shoreline over recreational interests and it did not conflict with the priorities explicitly set out in the SMA. RCW 90.58.020. Because a moratorium is only a temporary suspension of established regulations, it does not repeal, amend, or contradict them. It did not alter the procedures for adopting shoreline regulations as in Lauterbach. It did not impose different regulations as in Ritchie. It also did not restrict activities that were exempt from the SMP requirements or that required approval by the Department of Ecology (DOE). The SMA does not expressly prohibit cities from imposing moratoria on shoreline development. In the absence of an express prohibition against imposing moratoria, there can be no conflict with the SMA.
¶ 64 The lead opinion opines that the legislature expressly granted authority to local *29 government to adopt moratoria under multiple enabling statutes in 1992 and failed to do so under the SMA. Lead opinion at 23-24 (citing legislation adopted under chapter 35.63 RCW, chapter 35.22 RCW, chapter 35A.63 RCW, chapter 36.70A RCW, chapter 36.32 RCW, and chapter 70.05 RCW). However, the legislation the lead opinion cites did not contain express grants of authority to adopt moratoriarather, it imposes limitations on existing powers to adopt moratoria. For example, one of the statutes included in the legislation, RCW 36.70A.390, states, in pertinent part:
A county or city governing body that adopts a moratorium . . . without holding a public hearing on the proposed moratorium . . ., shall hold a public hearing on the adopted moratorium . . . within at least sixty days of its adoption, whether or not the governing body received a recommendation on the matter from the planning commission or department. If the governing body does not adopt findings of fact justifying its action before this hearing, then the governing body shall do so immediately after this public hearing. A moratorium . . . adopted under this section may be effective for not longer than six months, but may be effective for up to one year if a work plan is developed for related studies providing for such a longer period. A moratorium . . . may be renewed for one or more six-month periods if a subsequent public hearing is held and findings of fact are made prior to each renewal.
(Emphasis added.) The phrases "that adopts a moratorium," "on the proposed moratorium," and "on the adopted moratorium" plainly acknowledge that the local government already has authority to adopt the moratorium and the statute merely imposes limits on that authority.
¶ 65 The lead opinion also insists that the city's moratorium "prohibits what state law permits," because without amending its SMP, the city "block[ed] developments which the SMP approved." Lead opinion at 23. However, the local government has no affirmative obligation to accept permit applications.[2] RCW 90.58.140(1); WAC 173-27-140. It simply requires the city to review applications once they have been accepted to ensure that they comply with the SMA. Thus, the moratorium did not amend or violate any requirements of the SMA; at most, it delayed acceptance of applications.
¶ 66 Because the SMA does not prohibit the use of moratoria or impose an affirmative obligation on local government to accept applications, the lead opinion errs in concluding there was a conflict with the SMA.
¶ 67 We apply a two-part test to determine if an ordinance is a reasonable exercise of police powers. First, it must "promote the health, safety, peace, education, or welfare of the people." Weden, 135 Wash.2d at 700, 958 P.2d 273. Second, the requirements of the ordinance must have a reasonable relationship to its underlying purpose. Id.
¶ 68 In Weden, we concluded that an ordinance prohibiting the use of PWCs in county waters reasonably related to the county's interest in protecting the shoreline property and public safety. Id. at 700-01, 958 P.2d 273. We reasoned that San Juan County made a logical distinction in singling out PWCs. Id. at 702, 958 P.2d 273. We rejected Weden's argument that community complaints or public distaste for certain activities could not be a basis for government action, noting that the record also contained evidence of problems caused by PWCs. Id. at 701, 703, 958 P.2d 273. We also held it was *30 reasonable for the legislature to enact laws that improved the economy of the state. Id. at 701, 958 P.2d 273 (citing CLEAN v. State, 130 Wash.2d 782, 806, 928 P.2d 1054 (1996)).
¶ 69 The lead opinion erroneously concludes that the moratorium was not reasonable because it did not allow for the construction of protective bulkheads and private docks, which are exempt from the permitting requirements under the SMA.[3] But it acknowledges that Ordinances 2001-34 and 2001-45 contained provisions exempting shoreline permits for single-family residences and their normal appurtenances. Lead opinion at 18. Ordinance 2002-29 also did not amend the exemption for single-family residences and normal appurtenances. In addition, although construction of protective bulkheads and private docks is exempt from the permitting requirement, they must still comply with the SMA and are subject to the city's review to ensure compliance. RCW 90.58.140(1); WAC 173-27-140. Thus, at best, the city only delayed its review of proposals to construct protective bulkheads and private docksit did not prohibit them in violation of the SMA.
¶ 70 The only possible conclusion to draw from all the evidence is that the city acted reasonably in adopting its moratorium because it promoted the health and welfare of the public related to the city's interest in protecting the shorelines from overdevelopment while it amended its SMP and comprehensive plan.
¶ 71 Lastly, as in Weden, the city's moratorium was local because it affected only the shorelines within the city's boundaries. 135 Wash.2d at 706, 958 P.2d 273.
¶ 72 I would conclude that the city has constitutional authority to adopt moratoria on shoreline development arising out of its police powers under article XI, section 11. The moratorium conformed with the powers granted to the city under article XI, section 11 because it did not conflict with the SMA, it was a reasonable exercise of the city's police power, and it was purely local.

Article XVII, Section 1
¶ 73 The lead opinion also concludes the city did not have authority to adopt its moratorium because article XVII, section 1[4] declares state shorelines subject to state regulation alone and does not grant broad police powers over state shorelines to local government.[5] Lead opinion at 21. Although the State asserts ownership of all state shorelines in article XVII, section 1 of the state constitution, state and local governments share authority for developing shoreline regulations under the SMA. RCW 90.58.140(3).[6] The State has expressly delegated exclusive *31 authority to local governments to administer the permit system. RCW 90.58.050; Samuel's Furniture, Inc. v. Dep't of Ecology, 147 Wash.2d 440, 448, 54 P.3d 1194, 63 P.3d 764 (2002). The lead opinion bases its assertions primarily on the public trust doctrine. Lead opinion at 21 (citing Rettkowski v. Dep't of Ecology, 122 Wash.2d 219, 232, 858 P.2d 232 (1993), aff'd in part and rev'd in part on other grounds, 128 Wash.2d 508, 910 P.2d 462 (1996); Caminiti v. Boyle, 107 Wash.2d 662, 669, 732 P.2d 989 (1987)). Though it reluctantly admits that "[a] state statute, such as the SMA, may serve to delegate some state power," the lead opinion contends that because the city did not rely on that delegation of state power when it adopted its moratorium it cannot rely on it to justify the moratorium, after the fact. Lead opinion at 21-22.
¶ 74 Contrary to the lead opinion's assertions, the legislature may exercise the regulatory authority arising out of its sovereignty over state shorelines through a state agency or a local subdivision of state government without violating the public trust doctrine. In Caminiti, we held that the public trust doctrine was not violated where private owners of land that abutted state tidelands and shorelands were permitted to build docks subject to regulation and control of a state agency. 107 Wash.2d at 666, 673-74, 732 P.2d 989. Although the public trust doctrine was not a central issue in the case, we noted that the State's delegation of responsibility for regulation and control over dock construction to a state agency did not violate the public trust doctrine. In Rettkowski, we concluded that the State's duty did not devolve on DOE, but only because DOE's enabling statute did not give it authority to assume the State's public trust duties. 122 Wash.2d at 232, 858 P.2d 232. Here, the SMA explicitly grants local government exclusive authority to administer the permit program established in the SMP. RCW 90.58.050; Samuel's Furniture, 147 Wash.2d at 448, 54 P.3d 1194.
¶ 75 Because the city has authority to administer the permit program, it also has authority to defer acceptance of permit applications as it deems necessary to ensure compliance with the SMA. I would, therefore, conclude that the city acted within its authority under article XVII, section 1 when it adopted its moratorium because the SMA delegates authority to local government to administer the permit program regarding the use of shorelines within the local government's jurisdiction.

Attorney Fees
¶ 76 Finally, Biggers are not entitled to attorney fees and costs because they did not prevail and because the case did not involve a site-specific land use decision. Attorney fees and costs are awarded only to a prevailing or substantially prevailing party of a city's decision to "issue, condition, or deny a development permit" that involves a site-specific shoreline permit "or similar land use approval or decision." RCW 4.84.370(1) (emphasis added). In a decision involving a substantial development permit under chapter 90.58 RCW, a party must have been the "prevailing party or substantially prevailing party before the shoreline[s] hearings board," as well as "in all prior judicial proceedings." RCW 4.84.370(1)(a), (b) (emphasis added) (alteration in original). Where a particular site is not at issue or where a party did not prevail at all levels, including the local level, the party is not entitled to fees and costs. Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 15, 57 P.3d 1156 (2002).
¶ 77 The lead opinion reasons Biggers are entitled to attorney fees and costs because the moratorium falls within the meaning of a "`land use approval [or] decision'" similar to the actions expressly listed in the statute and because the moratorium was "initiated through a site-specific determination." Lead opinion at 25. But it is clear from the text of the statute that an actual permit decision is a necessary requirement before a party may request an award of fees and costs under RCW 4.84.370. See, e.g., Tugwell v. Kittitas County, 90 Wash.App. 1, 15, 951 P.2d 272 (1997); Henderson v. Kittitas County, 124 Wash.App. 747, 758, 100 P.3d 842 (2004).
¶ 78 I would reverse the Court of Appeals. The city has constitutional authority to adopt moratoria on shoreline development arising *32 out of its police powers under article XI, section 11, and the moratorium was consistent with that authority because it did not conflict with the SMA, it was a reasonable exercise of the city's police power, and it was purely local. The city also has constitutional authority under article XVII, section 1 because the SMA delegated the authority to local government to administer the permit program regarding the use of shorelines within the local government's jurisdiction.
¶ 79 Finally, Biggers are not entitled to attorney fees and costs under RCW 4.84.370 because a particular site is not at issue, there was no land use approval or decision, and they did not prevail or substantially prevail at all levels.
WE CONCUR: CHARLES W. JOHNSON, SUSAN OWENS and BARBARA A. MADSEN, JJ.
NOTES
[1] "Alterations of the natural condition of the shorelines of the state, in those limited instances when authorized, shall be given priority for single family residences and their appurtenant structures, ports, shoreline recreational uses including but not limited to parks, marinas, piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state and other development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state." RCW 90.58.020 (emphasis added).
[2] All institutions, including government, like to keep their options open but it is often a risky proposition. Increased flexibility normally comes at a higher cost. Here, the City can keep its options open at no cost to itself because virtually the entire risk is imposed on the owners. The private citizen's risk of loss is a social cost, whether or not it is recognized by the government. See W. Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 51, 720 P.2d 782 (1986).
[3] The parties made contradictory arguments as the case progressed. We briefly summarize them at each stage. Biggers also made several allegations that they do not raise on appeal and we do not address.
[4] Article XVII, section 1 of the Washington Constitution states, in pertinent part, "[t]he state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."
[5] This court routinely declines to accept new case theories which have not been raised in the lower courts. We will not normally consider an issue in absence of adequate argument below. Clearly, all parties deserve sufficient notice regarding possible legal theories, and such issues are most appropriately developed in the Court of Appeals. See Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett, 146 Wash.2d 29, 37, 42 P.3d 1265 (2002).
[1] The lead opinion would grant the homeowners motion to strike any extended arguments not made on this issue beyond those made in the lower courts. I would not. Custom aside, this court can review all arguments necessary to serve the ends of justice. Tuerk v. Dep't of Licensing, 123 Wash.2d 120, 124, 864 P.2d 1382 (1994).

Further, the issue has been sufficiently raised in my opinion. Judge Costello held that state law preempted the moratorium as an exercise of the police power. Mem. Decision, Costello, J. at 7. That ruling was challenged in Bainbridge Island's brief to the Court of Appeals. City of Bainbridge Island's Opening Br. at 37-45. In its brief, the city framed the issue and provided the relevant legal test to evaluate the issue. Id. at 37-38. The Court of Appeals did not consider this issue, but that does not preclude us from considering it in full.
[1] Article XI, section 11 of the Washington Constitution states "[a]ny county, city, town or township may make and enforce within its limits all such local police, sanitary and other regulations as are not in conflict with general laws."
[2] At oral argument before this court, Biggers' attorney asserted for the first time that the SMA establishes an "affirmative obligation" for local government to accept and process all applications for shoreline development and that the city's moratorium conflicted with general law. Wash. State Supreme Court oral argument, Biggers v. City of Bainbridge Island, No. 77150-2 (Mar. 16, 2006), audio recording by TVW, Washington State's Public Affairs Network, available at http:// www.tvw.org. The SMA does not impose any such obligation on the city. RCW 90.58.140(1) states that no development may occur unless it is consistent with the SMA and the applicable SMP. RCW 90.58.140(2) states that substantial development shall not occur unless a permit is obtained from the government entity responsible for issuing the permit. RCW 90.58.140(2)(b) states that a permit shall be granted only when the proposed development is consistent with the SMA and applicable SMP. Further, RCW 90.58.140(7) places the burden on the applicant to prove that a proposed substantial development is consistent with the SMA and applicable SMP.
[3] The lead opinion argues that suspension of the application process was a "clear violation of property owners' rights," that "suspension of the application process left private property owners to bear the costs associated with this denial of process (including property erosion and economic loss)," and that "the [c]ity's procrastination resulted in a physical degradation of these private owners' property without any direct cost to the [c]ity." Lead opinion at 17. But we do not know if the respondents suffered any damage as a result of the city's moratorium, and the lead opinion cannot point to a single example in the record of such damage because this case comes to us on declaratory judgment.
[4] Article XVII, section 1 of the Washington Constitution states, in pertinent part, "[t]he state of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide, in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes."
[5] The lead opinion argues the city's "belated[ ]" attempt to rely on a "new right of local government to issue moratoria" under article XVII, section 1 fails because it was based on a theory regarding state regulation of state shorelines that was not argued to the trial court or the Court of Appeals. See lead opinion at 21. I agree and for that reason alone would not reach the question. I respond only because the lead opinion focuses the bulk of its analysis arguing that local governments lack authority under article XVII, section 1 to regulate state shorelines. Id. at 17, 21-22.
[6] RCW 90.58.140(3) states "[t]he local government shall establish a program, consistent with rules adopted by the department, for the administration and enforcement of the permit system provided in this section. The administration of the system so established shall be performed exclusively by the local government." (Emphasis added.)